Good morning, Eric Grill with the Michigan Department of Attorney General on behalf of the appellants. I'd like to reserve three minutes for rebuttal. Your Honor, we're here to ask the court to reverse the district court's entry of a preliminary injunction on the grounds that the district court made several erroneous legal conclusions. Principally amongst these is the finding of a likelihood of success beginning with the claim of viewpoint discrimination under the First Amendment. It is our contention and we believe that the case law supports this that payroll deductions are not speech. We point principally to this court's decision in the Bailey case from 2013 where this court strongly stated that the Supreme Court's decision in the ESRSA makes it clear that payroll deductions are not speech and so we need go no further in this argument. What would happen if the state got rid of payroll deductions for everybody, including even a corporation, its own employees? Would that be okay? I believe that would be okay, Your Honor, because again the principle is if they're not speech then they can be regulated or prohibited outright. This court again in Bailey described the act of payroll deduction as a ministerial one and described that the administrative process in which that deduction occurs is not a forum of any kind. So really this court's Bailey decision should have been the end of the discussion as far as the First Amendment viewpoint discrimination claim goes. But even further than that in the PISA case from 1998 this court again stated that there is no constitutional right to payroll deductions. So we have two Sixth Circuit decisions indicating that payroll deductions are not speech. The plaintiffs, the appellees in this case have attempted to distinguish these cases as addressing public unions, but that would only go toward the state's interest in regulation. It doesn't have any effect on whether or not the activity itself constitutes speech. More pointedly, the appellees have failed to indicate any legal authority indicating that payroll deductions are speech. Doesn't USERRA reserve the question of the possibility of a viewpoint discrimination setting? I mean, I don't know, what do you think of, isn't that what that footnote is doing? USERRA discusses the matter and I think there is some indication in Justice Ginsburg's concurring opinion that she thought it was significant that there was, that it's dealt with public unions and not private ones. However, Your Honor, I'd have to point back to this court's decision in Bailey, interpreting the USERRA decision. USERRA didn't come after Bailey, Bailey came after USERRA and this court has interpreted USERRA to say, payroll deductions are not speech. So at least as far as this circuit is concerned, they're not speech and as this court's aware, one panel of this court cannot overrule another panel's interpretation or another panel's decision, so that should have carried the day here, at least as far as this preliminary injunction comes. I mean, our point is, how can you have a likelihood of success in the merits of your claim, when this circuit has twice indicated that the activity in question is not speech? I take it you're giving the same answer to one of their points, which is, you know, unions and corporations are not on equal footing here, when you take away this option, because most union members aren't employees of the union, whereas corporations, they're all employees, they're not at some other location. So I guess their idea is that this does have the effect of disadvantaging the opportunities for political speech for one versus the other. That would follow up, if we get past the idea of whether or not the payroll deductions are speech, then we move into the idea of is there some preference or distinction being made between the corporate speech and the union speech, and I think that's one of the fundamental errors of the district court's conclusion and frankly of the appellee's argument. Unions and corporations are not being treated differently on the face of the statute. What we're dealing with here is not so much who receives the money, it's who's giving it. The whole purpose of these SSFs is to operate as a conduit for corporate or labor union speech and how their contributions are to be channeled. When we're talking about the payroll deductions, the corporations operate the payroll deductions for their payroll. They are allowed to make contributions to their own separate segregated fund or separate segregated funds to which they are affiliated. That's part of their solicitable class. That's under section 55 of the Michigan statute in question. So the corporation can give to itself. The problem is when we get into the idea of corporations gathering these payroll deductions for some other SSF, for a labor union or some other non-affiliated non-profit or some other corporation, like General Motors couldn't give to the Apple Computer Corporation SSF any more than they could give to the union. Similarly, the union for itself could operate a payroll deduction for its employees. They can also operate payroll auto-deducts from the membership's bank accounts. They are not restricted from how they collect funds from their own membership. They can also collect funds from their own payroll, from their own corporation. But corporations don't have members. Unions have members. The unions have members, but they also have employees. I'm granting you that the treatment of employees is equal. It's just the reality that unions have members and corporations don't have members. I would say that the corporation does have shareholders and officers who are part of the solicitable class and who can also contribute to the corporation's SSF. So in the sense of disadvantage, what we're really talking about is convenience. And what the problem that we follow up from that is, is that the convenience comes at a cost. And that cost is illegal corporate contributions. The access to the corporation's payroll to its employees is a thing of value. This constitutes an in-kind contribution. They're being given something that other people, and more specifically, other separate segregated funds do not have and are prohibited from having. And it's important to note, I think, that even prior to the amendment in this case to Section 54.3 that eliminated the workaround, the loophole for allowing reimbursement for payroll deductions, it was already illegal for corporations to provide in-kind contributions or contributions of any kind to labor organization SSFs. What we had here was a workaround that said, well, we know you've had these payroll deductions for a while. We'll allow you to continue making these payroll deductions so long as you reimburse for the cost. And this was an interpretive statement by the Department of State. And that worked well enough for a time, but then the problem came when the Michigan Supreme Court had an opportunity to review that. And what the Michigan Supreme Court said in the for reimbursement. So that there's absolutely no statutory basis for this to be a permissible activity. And on top of that, the court found that the reimbursement did not cure the violation. And in so doing, the court specifically observed that payment back of the value of the reimbursement was part of the punishment for violating the act in that way. So it made no sense, according to the Michigan Supreme Court, to allow reimbursement to cure this violation. You rely on PISA for its stuff on the First Amendment. It does seem more helpful than not for you in that argument. It doesn't seem so helpful for you on the impairment of contract claim, however. On the issue of the impairment of contracts, our problem with the impairment of contracts and what the court's conclusion there was, first of all, we've skipped ahead and we've overlooked the problem. The district court overlooked the problem of, do we have a valid enforceable contract? We have challenged, specifically in our district court pleadings and in the appeal in this case, that in order for this to be at least arguably a valid contract for the reimbursement of payroll deduction costs, you have to at least, there has to be something in the contract that would provide for that. The contract provisions pages that we've been given, we've been given I think about three of them, three or four pages from the contract, and it provides for the payroll deduction, but there's no reference in the contract whatsoever. Why aren't we allowed to assume that it's going to comply with the law and that once, if a PISA-like ruling is issued, it's only enforceable to the extent they do comply with the law, and if they don't comply with the law, then you're right, but I don't understand why we have to deal with that first. It seems normal to assume that they're going to comply with the law. First of all, Your Honor, I think you're absolutely correct that it is an assumption, but now we have come into the field to say we're challenging that. We're not sure that it is, and we have specifically made a point. They haven't pointed to a contractual provision that says we're going to comply with the law. That's just a funny thing to ask of people. Well, I think it's not so funny because, again, Your Honor... How often do contracts say, have a paragraph 77, we will comply with the law? Well, I would say that if you're... I don't even think that's like a rote macro thing you put into all contracts. When we're dealing with something like this, Your Honor, where the idea is, well, this is a narrow exception that's been carved out by the Department of State, an interpretive statement that allows this activity to be legal, I would expect that to appear in the contract to provide that we're going to reimburse, we're going to reimburse at this rate, at this frequency, and this is how it's going to work. How are you hurt if we accept their argument on the score? In other words, what ends up happening is we say, listen, to the extent it's an enforceable contract, okay, you've got to follow it, and then we'll see what happens. You haven't lost a thing. To the extent it's an enforceable contract, it's going to be honored. What has the state lost if that's the ruling? Well, the other problem that we have, Your Honor... What has the state lost if that is the ruling? I just don't understand how the state's prejudiced by that at all. Well, the state's prejudiced in the fact that we have enormous difficulty in monitoring whether or not reimbursement takes place. There's no subpoena power. There's no auditing power. So whether or not that occurs... Well, I have an opinion from this court saying it has to be honored. I mean, you're back to where you started. That's already true. In other words, if you're telling me the problem with these things is they're very hard to monitor, that was true before this law was passed. It'll be true if this contract is allowed to be enforced for whatever, the last couple of years of the CBA. So I don't understand how that adds anything to the argument. Okay. I think I understand the court. Go to the question of how are you prejudiced if it has to be enforced? If we get past the idea that we assume that the contract is valid even though there hasn't been discovery and we would say that if we have to assume or if there's a question of fact that ought to point against likelihood of success on the merits for a preliminary injunction. But if we got past that, we would still say, our fallback point would be to the statute should be interpreted prospectively to allow that contracts going forward. And so if we're going to say that there's a... You're still not answering the question I'm asking. I'm sorry, Your Honor. I'm not... My question is how are you hurt if this contract is honored through the end of the CBA given that any decision saying that the contract's enforceable will say that you've got to honor the reimbursement requirement in Michigan law? How is the state hurt? In that circumstance, Your Honor, I would agree that we're not prejudiced any further than we are other than the idea that we've got problems with reimbursement as a whole. But if we're only going to look at the idea that this contract through the end of its term is valid and then anything after that has to change and follow and comply with the amended version of 54-3. Just to make sure I'm following your argument, the reimbursement problem was true before this state law was passed. It's true after it. That was always a problem of monitoring where the reimbursement was going on, correct? Correct. And that's one of the reasons why the statute was amended was to eliminate this loophole that was causing problems that... Now you're back to your stronger argument, the First Amendment argument. I've lost my time. Does the Court have further questions for me at this point? All right. We're good. Thanks. Good morning, Your Honors. I think there's no dispute here that payroll deduction for separate segregated funds is a crucial fundraising mechanism. And that's recognized in ASERSA. It's recognized in the Miller case of the Sixth Circuit, which dealt specifically with the payroll deduction system in Michigan. And it's crucial for, and Judge Sutton, you asked about this, for union members. Because union members must rely on their corporate employer to allow them to make small, periodic, regular contributions to support their union's political activity through payroll deduction. You asked, well, what if Michigan just outlawed PAC checkoff across the board, which of course it hasn't done here. And I think the answer is that there would still be significant First Amendment implications even in that case. Why? Because PAC checkoff is a speech facilitating mechanism. And the First Amendment's protection extends not just to pure speech, but to those kinds of arrangements and mechanisms that facilitate speech. You can look at Meyer v. Grant, which dealt with, or Citizens for Tax Reform here in the Sixth Circuit, which dealt with paying petition circulators. Well, just out of curiosity, are there any cases holdings on that question I asked? In particular, I don't remember anybody. So it's totally neutral in every possible way it could be neutral, because no one can do it. Unions, corporations, you name it. I haven't seen one. I don't think it's been done. So the principle then is the principle about things that facilitate speech? Right. So in other words, well, Meyer v. Grant dealt with a prohibition on paying petition circulators. And the state wanted to say the same thing there. You can't pay petition circulators whether the petition is about tax reform or any other subject. So it wasn't viewpoint discriminatory, but it was speech inhibiting. And the court said that's not permitted. Certainly without at least surviving strict scrutiny. What often happens in those kinds of arguments is you have this debate about alternative ways to express yourself or alternative ways to raise money. And so maybe your argument that this hypothetical would violate the First Amendment would have had some traction 30 years ago when what we're talking about is people writing checks. I mean, that's the way this was done. And checkoff does really facilitate things in that world. But that world is so far gone. And right now, you know, there's Venmo, there's, you and I could make six contributions during this argument. So what do we care? I would say it depends, Your Honor, on the tint of your glasses because there is unrebutted record evidence in this case and in many others that for rank and file union members, hourly wage earners, payroll deduction is the most secure. Just so you know, I'm asking the question in response to the issue of whether you could get rid of payroll deduction overall. And I guess what I'm saying is that for union members, for hourly employees, they are used to payroll deduction. They trust it. And they're not used to using Venmo. And at least if you look at the record evidence in this case, it says that... That's just one example. I mean, people pay their bills online now. That's true. So, and I guess, let me not dodge the question because I think the record here is clear that for the people we're talking about, payroll deduction is by far the easiest and most comfortable and most accessible way of contributing on a regular basis in small amounts to your union's political activity. But putting that aside, we're not dealing with an across-the-board prohibition here. We're dealing with a prohibition that clearly is speaker-selective. And if we have learned anything from Citizens United, it's that when the government is picking and choosing whose speech it is enabling and whose it is inhibiting, you have serious First Amendment issues here. Let me just, if I can, turn to that question of reimbursement that you raised, or as it's somewhat pejoratively termed expungement by the state. First of all, they say that the theory of this act is that everybody should pay their own way. Corporations should pay for their own PAC fundraising. Unions should pay for theirs. That's inconsistent, though, with their removal of what has been a longstanding practice in Michigan, which is that in order to avoid a prohibited contribution, the union or any other entity can reimburse the cost of the payroll deduction. And then that neutralizes the transaction and it negates a contribution. It's not only in the context of checkoff. That's universally accepted in Michigan and elsewhere and at the federal level. Because without it, you can't do business. Just to make sure I'm understanding, the point you're making is everyone's agreement with reimbursement as a way to solve this problem of free-riding off of someone else's checkoff is proves that they didn't have to get rid of this. But that doesn't tell you anything about the First Amendment is what my reaction is. In other words, I get the idea that reimbursement neutralizes this policy problem you might call that a corporation is, quote, forced to facilitate a union's speech efforts. But what does that say about the First Amendment argument? That's what I don't quite understand. I think it goes to the First Amendment because, again, it's not pure speech that the First Amendment protects. It's the ability to fund political speech. And here we're talking about political speech, which gets paramount protection. So in other words, if you disable transactions, basic transactions that allow people to exercise their First Amendment rights, that has serious First Amendment implications. Now, they cite ESRSA and they cite Bailey and other cases dealing with the government as an employer. And of course, those cases are in that narrow group identified in Citizens United of cases where the government's own assistance of speech is at issue. And certainly, there's no right to compel the government to help you. But you do have what PISA calls the negative right not to be impeded by the government in your political speech. And that reimbursement concept is absolutely essential to facilitate or at least permit political speech. Let me give you an example. And this actually comes from the MEA case. You've got a sign maker. They can provide signs to a political candidate, but they have to be reimbursed. They have to be paid because otherwise, that's a contribution. So the candidate's payment of full market value negates the contribution the same way that, say, an employee had to use an ACH or a bank transaction. The bank could not provide that transaction for free. It would have to be reimbursed. That's a basic transactional necessity in order to operate in this campaign finance regime. And so, if you say no expungement, no reimbursement, and of course here, it's a targeted prohibition on reimbursement. But if you say no expungement, no reimbursement, no reimbursement, no reimbursement at all, that would be a seriously speech inhibiting policy for the state to undertake. But it's allowed when it comes to public unions. It is. And again, that's recognized in Citizens United because the difference, I thought the analysis in PISA between positive and negative rights was valuable. There's no positive right to have the government help you engage in political speech. So there's no positive right to the government's assistance. But we have a negative right, not for the government not to stand in the way of parties freely agreeing on political speech and here freely agreeing a union and a corporation to allow employees to check off their contributions. The corporation can't be forced to do it, and that's what PISA talked about. And they're not. This is all consensual. It's in collective bargaining agreements. It's agreed upon in the give and take of collective bargaining. Just like a candidate would agree with a sign maker, here's what I'll pay you for your signs, fair market value. I mean, that the government should not stand in the way of and cannot, I think, under the First Amendment except in the most cases, if they're not present here. Is there any difference between the fact, using your example, that the reimbursement for the sign occurs at the time the sign is, presumably, at the time the sign is delivered and then is used as speech? Whereas here, I don't think we know a lot about what these reimbursement mechanisms are, but I'm assuming the union doesn't send a check to the employer for every payroll period where there's a check off, do they? No. And it varies. I shouldn't say no. I think there's a lot of variation in how this is bargained and how it's done. So let's assume that the truing up, so to speak, occurs once a year. I'm just making that up as an example. Does the timing distinguish what happens with check offs versus your analogy to the sign maker? I don't think so, Judge McKeegan. Here's why. Typically, what happens is, and I happen to be familiar with this, a candidate orders signs or airtime or whatever and they're invoiced and then the payment can be made weeks later. And in fact, the Federal Election Commission's reporting accounts for that and tells candidates, you have to report that transaction at the time of the invoice, when there's an agreement, not when you actually pay the bill, which could come weeks later. So there's no, the simultaneity is not an issue. I'm just wondering why the, when the government requires you to report it is relevant to the question. I think it's taking into account the fact that sometimes the payment is made before, sometimes the payment is made at the time of the transaction or the payment can be made after the transaction. We all know in the political world there are a lot of these debts that are incurred because services are provided and they're never paid. And then that gets into the issue of whether you're making reasonable efforts to try to collect them to prevent there being a contribution. Right. And I thought Judge Sutton's questions sort of targeted that issue of the enforceability of the reimbursement concept. And, but I think that's beside the point here. I mean, there's no evidence in this record that the parties didn't reimburse or that these contracts were somehow defective and unenforceable ab initio, as the state argues here. Just out of curiosity, why has there been this disagreement about producing more than one or two pages of a contract? With all respect, I think you'd have to ask the state. I think our burden was to show the court below what these clauses look like that they're in the contract. You're the one that has the contracts and says that they have reimbursement provisions and that they are in accord with existing law and they say you won't give them the pages of the contract that corroborate that. Well I'm not sure that it matters. I'm really just more curious. I would respectfully correct two parts of that. One is we're not saying that we've been reimbursed. We're saying that there's an agreement. These are contractual, voluntary, uncoerced agreements to provide the checkoff. And we provided that language to the court. I don't think we had the burden to show that there was reimbursement. And to the second point, if the state had an issue about that, then they should have asked for the entire contract, which they didn't. But on behalf of your clients, you're the one bringing the impairment of contract claim. On behalf of your clients, you agree that it's fair if you win that the reimbursement requirement under Michigan law is enforceable with respect to these CBAs. Absolutely. There are Secretary of State rulings in Michigan that require that reimbursement. And if the reimbursement's not made, then there are mechanisms for enforcing it under the campaign finance law. But I'm curious about one statement that you made a moment ago, and maybe I didn't hear it correctly. I thought you said, we're not saying that the reimbursements are made. Did I misunderstand that? I don't think. What I was trying to say is that it's not our burden. It was not our burden in order to obtain a preliminary injunction to say that the reimbursements are made. We just When you say, I want to make sure I'm following this question. Are you talking before? Is the question, have the reimbursements been made to date? Are the accounts evened up to date? Is that the question you're answering? Are you answering a future question if you win the impairment claim? Well, I'm not sure what question I'm answering. Well, let me go back to the question. I think I hear you saying that you just have to say that there is a reimbursement clause in the contracts, and if they want more, it's their problem. But that you don't have to say that the reimbursements that are required by the clauses have actually been made either before, after, or ever. Is that what you were saying? No, Your Honor. I'm not saying that we have to say, or had to say, that there were reimbursement clauses in the contracts. I don't think that was our burden. So you're saying that this injunction should stand regardless of whether there are or are not reimbursement provisions in the contracts? Yes. So in other words, you're saying that there's an impairment of contracts regardless of whether you have to comply with a law that says you have to reimburse. If I'm understanding that correctly, that seems sort of a peculiar argument. Well, I would say this. If their argument is that the contracts clause doesn't apply because these contracts were illegal or unenforceable, and I'm not sure that's even a valid theory under the contracts clause, and I say that because that doesn't, to me, have constitutional magnitude. If there is a breach or a violation of state law, then that's remedied at the state level. And it really doesn't have anything to do with whether an agreement to provide the payroll deduction is worthy of protection under the contracts clause. If there is a defect in the performance of that agreement, then that's remedied under the state law. So you have a contract, a CBA, that doesn't say anything about whether you allow checkoff based on race. It's just silent. It just says about checkoffs. The assumption is if there's an impairment of contract clause claim, and you win, that when you enforce the CBA, you're not only going to use it for people that are white or African American. And if you tried to do that, state law, federal law, would prohibit that, and you'd be stopped in your tracks. Likewise, if you have an agreement that doesn't have a reimbursement clause, and you try to enforce it without reimbursement, state law equally would come into play and force you to comply with that rule. That analogy is the same. That works. Yes. I agree. And none of that reflects on the federal constitutional question that we're talking about, which is whether the contracts clause protects that agreement, irrespective of whether there may be defects in the performance of it. All right. I think we understand that. Thank you very much. Appreciate it. Mr. Gryll? I just have a few points in response to the appellee's arguments. Do you want to just respond to the last point we were just on? He agreed with that way of thinking about it. Do you agree with that way of thinking about it? I think I understand the court's question, and I think under the way that the court has framed it, I would, in the idea that, because at that point, we're talking about prospectively going forward, a new CBA would be bound by 54-3. Existing current contracts would have their existing current promises and would be enforced. As well as whatever the state and federal law rules are that are the backdrop of every contract. And I think the only important thing that struck me about this particular set of circumstance was for the purposes at a preliminary injunction stage, and we're talking about likelihood of success and the merits. My problem with it is the idea of, we made a very simple question of, you know, you haven't shown any part of your contract that complies with existing law, even if we allow reimbursement. If we accept the interpretive statement, you haven't even shown that your current contract provides for that. It would be the easiest thing in the world to defeat that argument just to show us the one page of the contract that deals with that, and they've never produced it. You kind of conceded this point right at the beginning anyway, didn't you, by saying in the lower court that you interpreted the statute not to apply to existing contracts, only to the rollovers of the contract? Only in the idea that if we're talking about a valid contract. You know, our first objection under the, our first argument under the contract clause is that they have not demonstrated the existence of a legal contract. They're providing for payroll deductions, but they're not providing for the thing that would even arguably, you know, pre-MEA, pre-54.3 amendment have allowed that to, you know, to even exist. Even before the amendment to 54.3, payroll deductions were not legal. That was why we had the interpretive statement. So Nikoloff is arguing, as I understand it, from a federal constitutional standpoint, it doesn't turn on the underlying compliance with Michigan law. You either have the federal right or you don't. You seem to be saying that if it doesn't have the reimbursement language, therefore it's illegal, and therefore it's not protected under the contracts clause, right? Yes. So you do disagree with him about whether there needs to be a reimbursement clause in the contract in order to be invoking your contracts clause under the Constitution? Correct. And again, it seems to me the simple... Why is that? That's back to my hypothetical. Most contracts don't say we're going to allocate these rights on an even-handed basis regardless of the race or religion of the beneficiaries. They don't say that. My response, Your Honor, would simply be if we're talking about something in this particular field where for anyone else, payroll deductions would be illegal. If I run a corporation and I want to run a payroll deduction for anyone else's SSF, I can't do that. The only thing that makes it arguably legal for the labor organizations is this interpretive statement that provides for you must reimburse in order to make this legal. And if you're going to follow that, if you're going to try to fall under that exception, I would expect that to be in the contract because, again, it has to provide for how often are you making the reimbursement? What is the value that we place in this reimbursement? These are things that would have to be bargained for and negotiated with, in my opinion. Started by emphasizing the preliminary injunction status or stage of this case, it seems to me that cuts the other way on this issue. I mean, preliminary injunctions, there's not usually that much time for discovery, the whole point is to preserve the status quo based on likelihood of success and the merits. Often after preliminary injunctions are granted, you can still go back and do this. In this particular case, I still don't see the prejudice. If they agree, they have to comply with this rule going forward if the contract's enforceable. So I don't really see it. But I guess my point is this was a preliminary injunction. And I think that in my response, Your Honor, I would say that as a preliminary injunction, how can they demonstrate likelihood of success and the merits when they haven't even demonstrated that they've been complying with the law and that the contract was legal in the first place? That's my argument on the contract clauses. Where have we seen or when have they ever demonstrated as the moving party for a preliminary injunction that their contract was enforceable? Is there anything just absolutely indispensable on the First Amendment thing you want to tell us? I think I've addressed the idea, Your Honor, that it's not targeted reimbursement. Labor organization SSFs are being treated exactly the same as every other third party unaffiliated SSF. And I think that's, I can't think of anything else to say unless the Court has more questions for me. I think we're good. Thanks to both of you for helpful briefs and oral arguments. We appreciate it. Thank you. Case will be submitted. The clerk may call the next case.